Cesar **TORRES TORRES**, Plaintiff,

v.

**COMISION ESTATAL de ELECCIONES de PUERTO RICO and Marcos Rodriguez Estrada, President, Defendants.**

**Civ. No. 88–1451 HL.**

United States District Court, D. Puerto Rico.

Sept. 23, 1988.

Nicolás Nogueras, Miguel Pagán, Eliezer Aldarondo Ortíz, Hato Rey, P.R., for plaintiff.

David Rive Rivera, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

The matter before the Court is a constitutional action for declaratory, injunctive, and monetary relief. Plaintiff Cesar Torres–Torres asserts jurisdiction in this Court based on 42 U.S.C. sect. 1983, 28 U.S.C. sections 1331, 1341, 1343, 2201, and 2202.

Plaintiff avers that defendants, Comisión Estatal de Elecciones de Puerto Rico ("Elections Commission") and Marcos Rodríguez–Estrada, President of the Elections Commission, unconstitutionally deprived him of his guaranteed rights protected under the first and fourteenth amendments to the United States Constitution, by decertifying him on August 9, 1988 as the New Progressive Party ("NPP") candidate for mayor in the municipality of Juncos, Puerto Rico, in the forthcoming November elections. Plaintiff alleges that defendants' acts were carried out under color of state law, pursuant to Section 3.01(a)(6) of Law No. 146 of June 18, 1980, 21 L.P.R.A. section 3001(a)(6), as amended ("Municipal Organic Act"), and Law No. 4 of December 20, 1977, 16 L.P.R.A. section 3001 *et seq.* ("Puerto Rico Electoral Act"). Plaintiff challenges the constitutionality of Section 3001(a)(6) of the Municipal Organic

1. Sect. 3001. Requirements, selection, term of office and replacement of Mayor.

    (a) Every candidate for Mayor must fulfill the following conditions as of the date of the election:

    . . . .

Act on its face and as applied to him.[1] Plaintiff, the former Mayor of Juncos, also alleges that he was unconstitutionally deprived of his elective position for the present term when the Elections Commission dismissed him from office.

Essentially, plaintiff asserts two causes of action—one involving removal as mayor and the other involving decertification as a mayoral candidate. As to plaintiff's first cause of action, the Court is requested to declare that he has been unconstitutionally deprived of his position as mayor of Juncos and to order his reinstatement to said position. On the second cause of action, plaintiff seeks a declaration that his decertification by the Elections Commission was constitutionally impermissible; that the Elections Commission be enjoined from excluding him from appearing on the ballot for the 1988 elections; and that Section 3001(a)(6) of the Municipal Organic Act be declared unconstitutional.

Defendants move to dismiss the complaint on the basis that this Court lacks jurisdiction over the Elections Commission pursuant to the Eleventh Amendment sovereign immunity doctrine. Defendants also contend, as ground for dismissal, that plaintiff has failed to join indispensable parties.

### I.

### A. PROCEDURAL HISTORY

The complaint in this case was filed on August 22, 1988. On September 9, 1988, the last day for a political party candidate to appear on the ballot for this year's general elections, plaintiff filed a motion for a temporary restraining order. Chief Judge Pérez Giménez issued a temporary restraining order until September 19, 1988, and set the matter for a show cause hearing before the undersigned, for September 19, 1988. *See* Order of September 9, 1988.[2]

    (6) Never to have been dismissed from a position or employment for improper conduct in the performance of his duties.
21 L.P.R.A. sect. 3001(a)(6).

2. Because the undersigned was away from this jurisdiction at the time of the filing of the motion for temporary restraining order, the matter

At the conclusion of the hearing, the Court, with the parties' consent, extended the temporary restraining order until September 29, 1988. Subsequently, the Attorney General of Puerto Rico sought and obtained leave to intervene.

## B. FACTUAL BACKGROUND

Plaintiff was elected Mayor of the municipality of Juncos, Puerto Rico in 1976 and was reelected in 1980 and in 1984 on the NPP ticket. Plaintiff seeks to run again as the NPP candidate in this year's elections.

On April 2, 1986, the Governor of the Commonwealth of Puerto Rico filed a complaint before the Municipal Complaints Commission ("Complaints Commission"), the administrative agency empowered by law to adjudicate complaints against any mayor of Puerto Rico charged with misconduct while in office. 21 L.P.R.A. sect. 3101. The Governor leveled several charges against plaintiff consisting of violations of the Municipal Organic Act, misuse of public funds, abandonment, inexcusable neglect, and conduct detrimental to the best interest of the public in the performance of his duties.

The Governor summarily suspended plaintiff from office pursuant to Puerto Rico law, 21 L.P.R.A. sect. 3005.[3]

After eighteen days of hearings,[4] on June 26, 1987, the Complaints Commission ordered plaintiff's removal from office based on the Governor's charges. Joint Exhibit II.

On August 3, 1987, plaintiff filed an appeal before Puerto Rico Superior Court, Caguas Part. The Superior Court found that it had jurisdiction, stayed the resolution of the Complaints Commission, and interlocutorily ordered the reinstatement of plaintiff to the office of Mayor of Juncos. On appeal, the Puerto Rico Supreme Court reversed on the ground that the lower court lacked jurisdiction to hear the matter and to order reinstatement because plaintiff had failed to file a timely appeal from the Complaints Commission's decision to the Superior Court. *Gobernador v. Alcalde de Juncos*, 88 JTS 73 (June 2, 1988). As a result of plaintiff's untimeliness, the Complaints Commission's factual findings and conclusions are final and not subject to review.

In May of 1988, the mayoral candidate of the Popular Democratic Party ("PDP"), Rafael Beltrán, filed a complaint in the Superior Court, San Juan Part, requesting the disqualification of his political opponent, Torres, pursuant to 21 L.P.R.A. sect. 3001(a)(6). Beltrán claimed that because Torres was removed as Mayor for improper conduct, he could not be certified as mayoral candidate by the Elections Commission.

was referred to the Chief Judge for disposition pursuant to Local Rule 302.9.

**3.** It is not clear from the record the exact date on which the Governor issued his decision to summarily suspend plaintiff. According to Puerto Rico Supreme Court opinion in *Gobernador v. Alcalde de Juncos*, 88 JTS 73 (June 2, 1988), the Governor mailed a letter to plaintiff on the same day he filed the complaint with the Complaints Commission. According to the Complaints Commission's opinion, the Governor sent the suspension letter the day before the complaint was filed. The letter stated that the suspension was to take effect on April 2, 1988. Joint Exhibit II. Whereas, in *Torres Torres v. Hernández Colón*, 656 F.Supp. 372 (D.P.R.1987), plaintiff appears to have been summarily suspended two days after the complaint was filed.

We note that according to Puerto Rico law, 21 L.P.R.A. sect. 3005, the governor may in his discretion suspend a mayor from office and salary "(o)nce the charges have been filed *and*

notified to the mayor ..." (emphasis added). *See Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982). There is some evidence that the Governor may have exercised this discretion prematurely and in violation of the very section he cites to support his authority.

**4.** During the administrative proceedings, plaintiff brought a civil rights action in federal court claiming that the Governor, the Commonwealth Secretary of Justice, and two members of the Complaints Commission unconstitutionally deprived him of liberty and property interests without due process of law by summarily suspending him from his position as Mayor of Juncos and by providing him with inadequate post-suspension hearing. *Torres Torres v. Hernández Colón*, 656 F.Supp. 372. In that case, the federal court properly chose to abstain from interfering with the ongoing local proceedings pursuant to the *Younger* doctrine and thereby dismissed the complaint. *Younger v. Harris*, 401 U.S. 37, 41–45, 91 S.Ct. 746, 749–751, 27 L.Ed.2d 669 (1971).

The Superior Court, Caguas Part, held that since the Complaints Commission's decision removing Torres was rendered final and unappealable by the Supreme Court in *Gobernador v. Alcalde de Juncos*, 88 JTS 73 (June 2, 1988), Torres is therefore barred from running anew as mayor pursuant to 21 L.P.R.A. section 3001(a)(6).[5]

On August 9, 1988, the Elections Commission decertified Torres as mayoral candidate for the NPP for Juncos pursuant to the Caguas Superior Court judgment in *Beltran v. Torres*, Civ. No. 88-1069 (P.R. Superior Ct. July 1988).

On August 22, 1988, the Caguas Superior Court, in another action filed by plaintiff against the Elections Commission, again refused to set aside the Complaints Commission's decision for lack of jurisdiction because of plaintiff's failure to file the record with the court.

On September 8, 1988, the NPP requested that Rafael Bonilla-Robles be certified as their mayoral candidate for Juncos pending outcome of this case.

Notwithstanding plaintiff's predicament, he has never been criminally tried, nor convicted in any court of law. Plaintiff and his main accuser, Corsino, were the subject of a federal grand jury investigation. Corsino was indicted, tried and convicted. Plaintiff was not indicted.

## II.

Before we turn to the merits of the constitutional claim under equal protection, various threshold issues raised by defendants must be addressed.

## A. FEDERAL JURISDICTION

■ An examination of the issues before us demonstrates that plaintiff has successfully "made a federal case out of" his disqualification from the mayoral ballot under 21 L.P.R.A. sect. 3001(a)(6). While the power to impose restrictions on those seek-

ing public office is one reserved to the states under the tenth amendment, this power must be exercised in accord with the United States Constitution. In response to the argument that the tenth amendment should protect Commonwealth autonomy in regulating electoral privileges, we borrow Chief Justice Rehnquist's phrase, "The Tenth Amendment cannot save legislation prohibited by the subsequently enacted Fourteenth Amendment." *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S.Ct. 1916, 1922, 85 L.Ed.2d 222 (1985). *See also Chimento v. Stark*, 353 F.Supp. 1211, 1215 (D.C.N.H.1973), *aff'd.*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973); 63A AM. JUR.2d Public Officers and Employees sect. 36, at 690.. "The State may not deny to some the privilege of holding office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." *Turner v. Fouche*, 396 U.S. 346, 362-63, 90 S.Ct. 532, 541-42, 24 L.Ed. 2d 567 (1970).

Here, plaintiff alleges that 21 L.P.R.A. sect. 3001(a)(6), which disqualifies those people who have "been dismissed from a position or employment for improper conduct in the performance of [their] duties" from running for mayor, violates the equal protection clause of the Constitution. As such, this allegation raises a federal question, and the jurisdiction of this Court over the instant case is assured under 28 U.S.C. sect. 1331. *Lentini v. City of Kenner*, 479 F.Supp. 966 (E.D.Louisiana 1979); *Henderson v. Fort Worth Independent Sch. District*, 526 F.2d 286 (5th Cir.1976); *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973).

## B. JUSTICIABILITY

■ Nor does the political question doctrine impede this Court's exercise of jurisdiction. "Of course the mere fact that the suit seeks protection of a political right does not mean it presents a political ques-

---

5. An examination of the judgment entered by Judge Muõz-Arril reveals that Torres was in default, failed to appear at the June 17, 1988 hearing, and further failed, although granted an opportunity by the trial judge, to file a motion in opposition to the entry of judgment against him. Plaintiff's neglect in protecting his rights by first filing an untimely appeal from the Complaints Commission's decision, and his further failure to defend his decertification proceeding, is inconsistent with his quest for the mayoralty of Juncos. *See* Joint Exhibit III.

tion." *Baker v. Carr*, 369 U.S. 186, 209, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962). Moreover, none of the factors counselling the judicial branch to refuse to decide a case on justiciability grounds is present in the instant case. The question presented is the constitutionality of a Commonwealth statute, and neither the executive nor the legislative branch is committed to deciding that question. Judicially manageable standards are omnipresent here; "[j]udicial standards under the Equal Protection Clause are well developed and familiar." *Id.* at 226, 82 S.Ct. at 714. "When challenges to state action respecting matters of 'the administration of the affairs of the State and the officers through whom they are conducted' have rested on claims of constitutional deprivation which are amenable to judicial correction, this Court has acted upon its view of the merits of the claim." *Id.* at 229, 82 S.Ct. at 716 (quoting *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 183, 12 S.Ct. 375, 389, 36 L.Ed. 103 (1892)).

That the November 1988 elections lurk in the background of this case also does not compel this Court to refrain from making a decision on the merits. Elections, and the procedures and regulations associated with them, while largely left to state regulation, still must be conducted in accordance with constitutional dictates. *See Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). It is the function of the courts to enforce those dictates whenever federally protected rights are compromised by local electoral laws or proceedings.[6]

## C. ABSTENTION

We now turn to the issue of abstention raised by intervenor Commonwealth of Puerto Rico. As previously stated, the

case of *Gobernador v. Alcalde de Juncos*, 88 JTS 73 (June 2, 1988), is no longer pending. The Puerto Rico Supreme Court ruled that Torres failed to timely seek review from the Complaints Commission's decision before the Commonwealth Superior Court. This case, therefore, does not present an abstention problem. The ruling made by the Complaints Commission is final and unappealable. Federal courts must give to state court judgments the same full faith and credit as would be given by the state in which the judgment was rendered. 28 U.S.C. sect. 1738. Therefore, plaintiff's cause of action seeking a declaratory judgment that he has been deprived of his position as Juncos Mayor for the current term and seeking reinstatement to said post is precluded under Section 1738, which requires federal courts to give full preclusive effect to state court judgments over both issues and claims. We therefore dismiss this claim. *Arecibo Radio Corp. v. Commonwealth of Puerto Rico*, 825 F.2d 589 (1st Cir.1988); *Pasterczyk v. Fair*, 819 F.2d 12 (1st Cir.1988).

■ Review in *Beltran v. Torres* is still pending before the Puerto Rico Supreme Court. It is noted that abstention is the exception to the general rule of the "unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Before denying access to the federal forum to a litigant through the abstention doctrine, the federal court must ensure that plaintiff will have his federal claims heard either in a state forum or in a subsequent federal one. *Corporacion Insular de Seguros v. Garcia*, 680 F.Supp. 476 (D.P.R.1984). Although state courts can competently ad-

---

6. For those with a penchant for historical particularity, the first general election in Puerto Rico, following the change of sovereignty by the Proclamation of the Treaty of Paris, was held in 1899 to elect mayors, municipal judges, and members to local educational boards. The election was supervised by the Provisional Court of the United States for the Department of Porto Rico. *See* Quiñones–Calderón, *Trayectoria Política de Puerto Rico*, Ediciones Nuevas de Puerto Rico, at 10. Thereafter, the federal judi-

ciary at its District, Circuit and Supreme Court level has been called upon to adjudicate controversies arising from the application of Puerto Rico's electoral laws and procedures. *Partido Nuevo Progresista v. Hernández Colón*, 415 F.Supp. 475 (D.P.R.1976); *Partido Nuevo Progresista v. Barreto Pérez*, 639 F.2d 825 (1st Cir. 1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981); *Rodríguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982).

judicate federal claims, there may be "special circumstances" or "complex considerations" involved in a particular case that counsels against abstention.

■ Abstention is not required in this case. It is not clear from the record whether Torres has asserted his federal constitutional claims in *Beltran v. Torres*. Moreover, there are inherent delays in invoking the abstention doctrine that could cause "valuable federal rights to be lost in the absence of expeditious adjudication in the federal court...." *Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975). "Time is of the essence" in the case at hand. The general elections are less than two months away. We further add that the Puerto Rico Supreme Court has upheld the validity of the statute in question under the Puerto Rico Constitution. *Popular Democratic Party v. Ricardo Planadeball Poggy*, 88 JTS 80 (1988). Consequently, we must decide plaintiff's federal claim under the aegis of the United States Constitution.[7] *Cuesnongle v. Ramos*, 835 F.2d 1486 (1st Cir.1987).

## D. ELEVENTH AMENDMENT

Defendants contend that this Court lacks jurisdiction on the basis of eleventh amendment immunity. Defendants argue that the Elections Commission, an alter ego of the local government, cannot be sued in federal court without its consent.

■ Neither a state nor a state agency may be sued directly, in its own name, in federal court unless a state has waived its eleventh amendment immunity or Congress has overriden it. This immunity is applicable to the Commonwealth of Puerto Rico. *Ezratty v. Commonwealth*, 648 F.2d 770, 776 n. 7 (1st Cir.1981). To determine the applicability of the eleventh amendment, we look to the essential nature of the entity being sued and the effect of the proceeding. *Culebras Enterprises Corp. v. Rivera Rios*, 813 F.2d 506 (1st Cir.1987). The Elections Commission was created by the

Puerto Rico legislature. 16 L.P.R.A. sect. 3004. It was created for the purpose of "planning, organizing, structuring, directing and supervising the electoral body and all electoral procedures that govern any election to be held in Puerto Rico...." 16 L.P.R.A. sect. 3013. The legislature provides funding to the Elections Commission after reviewing the Elections Commission's Operating Expense Budget for each fiscal year submitted by the Governor. 16 L.P.R.A. sect. 3005. The Elections Commission has the power to sue. 16 L.P.R.A. sect. 3013. The statute is silent as to whether the Elections Commission can be sued.

■ Plaintiff seeks both monetary compensation and injunctive relief. The Elections Commission is immune from the damage claim, since any damage award would have to be paid out from the Commonwealth treasury. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (the eleventh amendment bars suits against a government official in her official capacity where it can be shown that the government entity would be directly affected by the judgment, if rendered. Nevertheless, the eleventh amendment does not bar suits involving injunctive relief which do not affect the state coffers). *Gay Student Services v. Texas A & M Univ.*, 612 F.2d 160 (5th Cir.1980), *reh. denied*, 620 F.2d 300 (5th Cir.1980), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). The crux of plaintiff's suit is for injunctive relief, ordering the Elections Commission and its President to allow him to appear on the ballot. The Supreme Court in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), held that prospective relief against a government officer in his official capacity is not barred by the eleventh amendment.

Even if the Elections Commission could not be sued for injunctive relief, plaintiff has also sued the President of said Commission. It is axiomatic that a suit against

7. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, n. 1, 5 L.Ed. 257 (1821) (Marshall, J., dissenting) ("It is most true, that this Court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction if it should.")

a state official in his official capacity for prospective relief is not precluded by the eleventh amendment. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Therefore, this Court can decide plaintiff's claim for equitable relief against both defendants.[8]

## E. PROPER PARTIES

■ Defendants contend that this action should be dismissed for failure to join indispensable parties. First, defendants argue that if plaintiff prevails and becomes the mayoral candidate for the NPP then this would anull the interest of Bonilla, the present NPP mayoral candidate. At the hearing held on September 19, 1988, Bonilla stated that he did not desire to intervene in the action. Based on the evidence submitted at the hearing, Bonilla is a "stand-in" candidate for Torres. Joint Exhibits VII and VIII. Thus, the Court finds that Bonilla is not an indispensable party. Fed. R.C.P. 19.

■ Second, defendants contend that co-defendant Rodríguez did not participate in the decision to dismiss plaintiff and therefore he is an improper party. This argument lacks merit. As President of the Elections Commission, Rodríguez is an indispensable party. Any injunctive relief that this Court may issue will have to be carried out by the President of the Elections Commission. Although plaintiff did not join as party defendants the other commissioners, the Court finds that the nonparty commissioners are necessary but not indispensable parties.

### III.

Plaintiff claims that 21 L.P.R.A. sect. 3001(a)(6) violates equal protection of the laws because it impermissibly conditions the right to run for mayor on its classification between those potential candidates who have been dismissed from a position for improper conduct and those who have never been so dismissed.

To adjudicate plaintiff's claim, this Court must first determine the appropriate standard for reviewing the constitutionality of the classification. The Supreme Court has generally applied one of three standards when faced with an equal protection claim: the rational basis test, *see McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961), whereby the challenged statute need only be rationally related to a legitimate state interest; an intermediate level of scrutiny, *see Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), employed most frequently in cases involving gender classifications and requiring that the classification serve important government interests and be substantially related to achievement of those objectives; and strict scrutiny, which requires that any classification involving a suspect class or burdening a fundamental right be justified by a compelling state interest. *See, e.g., Korematsu v. U.S.,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (suspect class); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (fundamental right). Determining the appropriate standard for reviewing the candidate restriction at issue in this case is not, however, an easy pick among the above standards.

The Supreme Court established the pattern for a shifting, fact dependent standard for reviewing candidate restrictions under the equal protection clause when it decided *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). It stated there that:

> ... the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review.... The existence of such barriers [to candidate access to the ballot] does not of itself compel close scrutiny (citations omitted). In approaching candidate restrictions, it is essential to examine in a realistic light the *extent* and *nature of their impact on voters* (emphasis added).

*Id.* at 142–43, 92 S.Ct. at 855.

■ According to *Bullock,* therefore, the standard of review for candidate restric-

---

**8.** For the distinction between personal and official liability, see *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) and *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

tions depends upon the extent and nature of the impact these restrictions have on the right to vote. In *Bullock*, 405 U.S. at 144, 92 S.Ct. at 856, the Supreme Court found that the mandatory filing fee system at issue had a "real and appreciable impact on the exercise of the franchise" and so exercised "close scrutiny" to determine that the challenged system was not "reasonably necessary to the accomplishment of legitimate state objectives."

Courts deciding cases after *Bullock*, especially those involving the constitutionality of durational residency requirements for candidates, used strict scrutiny [9]. Others, most notably the Supreme Court, eventually settled on a heightened scrutiny via a balancing test that resides somewhere between strict scrutiny and rational basis.[10] The latest articulation of the balancing test to be employed when reviewing candidate restrictions is set out in *Anderson v. Celebrezze*, 460 U.S. at 789, 103 S.Ct. at 1570:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. *In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.* Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional (emphasis added).

In *Anderson*, the Court cautioned that constitutional challenges to specific provisions of a state's electoral laws, such as the electoral provision at issue here, could not be resolved by any "litmus-paper test" that would separate constitutional restrictions from unconstitutional ones, and that the results of the application of the above test would not be automatic. *Anderson v. Celebrezze*, 460 U.S. at 789, 103 S.Ct. at 1570 (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)).

## A. PLAINTIFF'S CONSTITUTIONAL RIGHTS

▰ We first must examine the character and magnitude of the asserted injury to plaintiff's rights under the first and fourteenth amendments. First, plaintiff has no fundamental right to be a candidate. *See Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982);

---

**9.** *See, e.g., Chimento v. Stark*, 353 F.Supp. 1211 (D.C.N.H.1973), *aff'd.,* 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), where a seven year residency requirement to run for the office of governor was subject to strict scrutiny because of the barrier it posed to potential candidates, the corresponding limits it placed on the voters to elect a candidate, and the burden it placed on a candidate's right to travel interstate. The requirement was upheld, however, because of the state's interests in gubernatorial candidates being exposed to the state and its people, and to prevent frivolous candidacies. The court noted that the seven year requirement was not an outright ban, and that the impact on the voters' right to have a meaningful choice of candidates was negligible. *See also Wellford v. Battaglia*, 485 F.2d 1151 (3rd Cir.1973) (five year residency requirement for mayor struck down using strict scrutiny); *Lentini v. Kenner*, 479 F.Supp. 966 (E.D.La.1979) (two year residency requirement for city council members struck down under strict scrutiny). The above two decisions based their choice of the more rigorous standard both on the impact on the right to vote *and*

on the right to travel. In *Henderson v. Fort Worth*, 526 F.2d 286 (5th Cir.1976), the Court of Appeals struck down a three year residency requirement for school board members, using strict scrutiny solely because of the degree to which potential candidates were excluded from the ballot. It found the requirement to be absolute in its operation, denying access to a significant number of potential school board candidates and thereby causing a substantial impact on voters, without allowing a potential candidate alternative means to demonstrate expertise, familiarity or extent of political support.

**10.** Commentators have different names for this intermediate level of scrutiny. Tribe calls it "a mix of strict and minimal scrutiny," L. Tribe, *American Constitutional Law*, Sect. 13–20, at 783 (1978), while another commentator states that courts must subject candidacy restrictions to "independent judicial review" with a balancing test "that is less than strict, but not merely deferential." 2 R. Rotunda, J. Nowak, J. N. Young, *Treatise on Constitutional Law*, sect. 18.32, at 628 (1986).

*Bullock v. Carter*, 405 U.S. at 142–43, 92 S.Ct. at 855–56. He does, however, have a "federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. at 362, 90 S.Ct. at 541. Examining 21 L.P.R.A. sect. 3001(a)(6) on its face, we find it to be nondiscriminatory. Most notably, it does not discriminate on the basis of political affiliation nor on any factor not related to a candidate's qualifications to hold political office. *Clements v. Fashing*, 457 U.S. at 967, 102 S.Ct. at 2845.

We are aware, of course, that statutes that are nondiscriminatory on their face can be applied in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In the complaint, plaintiff points out that Governor Hernández Colón, a member of the PDP, filed the charges against the plaintiff, a member of the NPP, which led to plaintiff's dismissal. Such an allegation made in this politically charged setting, with the 1988 elections only six weeks away, cannot be summarily dismissed. We find, however, that 21 L.P.R.A. sect. 3001(a)(6) has not been discriminatorily applied to the plaintiff. The Complaints Commission, which investigated the charges against the plaintiff and eventually dismissed him, was found by this Court to be unbiased, *see Torres Torres v. Hernandez Colon*, 656 F.Supp. 372 (D.P.R.1987), and we are bound by that factual finding. Moreover, plaintiff failed to avail himself of judicial review of the Complaints Commission's decision by filing an untimely appeal. Further, this Court notes that another dismissed mayor, from the municipality of Lares, Rafael Pagán–Centeno, a member of the PDP, also faces disqualification under 21 L.P.R.A. sect. 3001(a)(6) once he has exhausted his right to judicial review of the Complaints Commission's decision dismissing him from office.[11]

The restriction placed on plaintiff's candidacy by 21 L.P.R.A. sect. 3001(a)(6) also interferes, however, with the fundamental right to vote.[12] As *Bullock* stressed:

> The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.... In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

405 U.S. at 143, 92 S.Ct. at 856.

We find that the impact on the voters as a result of plaintiff's disqualification from the November 1988 mayoral ballot to be an insubstantial one. The voters are not being denied their right to vote for a candidate of a particular political party or a candidate with a particular viewpoint, but only their right to vote for a particular candidate. Courts, when examining the impact on voters of candidate restrictions, have found such impact to be substantial only when a *class of candidates* is excluded.[13] *See, e.g., Clements v. Fashing*, 457 U.S. at 964, 102 S.Ct. at 2844 ("Our ballot access cases, however, do focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral

---

**11.** *López v. Pagán Centeno*, Civ. No. CS–88–1009, CS–88–1010 (P.R.Superior Court, Sep. 16, 1988), *aff'd.*, Civ. No. CE–88–524, CE–88–525 (P.R. Supreme Court, Sep. 21, 1988).

**12.** Any impact on voters, in turn, implicates other first amendment rights, namely the right to associate for the advancement of political beliefs. *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968); *Anderson v. Celebrezze*, 460 U.S. at 786–87, 103 S.Ct. at 1568–69. Because we find the impact on voters' rights to be insubstantial, see discussion *infra*, we also find the infringement on first amendment associational right to be negligible.

"[A]lthough groups of voters have a right to associate and advance a candidate to represent their interests, those associational rights do not seem to require that any *particular* individual serve as that candidate." L. Tribe, *American Constitutional Law*, 775 (1978) (emphasis in text).

**13.** "... [c]ourts have reviewed rather summarily laws that specify eligibility requirements for particular candidates, but have more carefully appraised the fairness and openness of laws that determine which political groups can place *any* candidate of their choice on the ballot." L. Tribe, *American Constitutional Law*, 774 (1978) (emphasis in text).

process"); *Anderson v. Celebrezze,* 460 U.S. at 793, 103 S.Ct. at 1572 ("It is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status"). The impact on voters' rights of the removal of *one particular candidate* is, therefore, negligible. *See Chimento v. Stark,* 353 F.Supp. at 1217 (disqualification of all potential candidates not residents of New Hampshire for seven years found to have negligible impact on voters' rights).

The United States Supreme Court, surveying its candidate restriction cases in *Clements v. Fashing,* 457 U.S. at 964, 102 S.Ct. at 2844, noted that it had employed heightened scrutiny when the candidate restrictions involved either the wealth of potential candidates [14] or those candidates belonging to other than the two major political parties.[15] In both types of cases, a class of candidates, either those candidates who could not afford the required filing fees or those candidates who were not associated with the major political parties, was excluded as a result of the challenged restrictions. Correspondingly, *the class of voters* who may have voted for a candidate according to his economic status, or for a candidate who expressed a political viewpoint other than that of the major political parties, was denied that choice. The impact on voters was in these cases found to be substantial. *See Anderson v. Celebrezze,* 460 U.S. at 792, 103 S.Ct. at 1571 (filing deadline for independent candidates placed a particular burden on an identifiable segment of independent-minded voters).

In the instant case, plaintiff does not represent a class of candidates, nor does 21 L.P.R.A. sect. 3001(a)(6) operate to exclude any identifiable class of candidates. It is not alleged here that the NPP is being denied access to the mayoral ballot; in fact, Bonilla, a member of the NPP, is presently on the ballot for the mayor of Juncos. The only other arguable class plaintiff may belong to—potential candidates dismissed from a previous position for improper conduct—could not claim to espouse any particular political viewpoint that the voters should have a fundamental right to choose. There is not any substantial impact, therefore, on any identifiable class of voters as a result of plaintiff's disqualification from the mayoral ballot in the upcoming elections.

### B. COMMONWEALTH'S INTEREST

We next turn to the interest of the Commonwealth offered as justification for the candidate restriction embodied in 21 L.P.R.A. sect. 3001(a)(6). Something is rotten in the Commonwealth of Puerto Rico.[16] There can be little doubt that this island is drowning in a sea of corruption at all levels.[17] Public corruption on the part of mayors is especially pervasive because, as the Puerto Rico Supreme Court has stated:

> The importance of the mayor's functions in the structure and functioning of a social cell as vital as a municipality is obvious. A mayor is the chief of local executive power; the administrative chief of the various municipal departments and services; a partner of the municipal assembly in the discharge of

**14.** *See, e.g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (mandatory filing fee schemes for candidates struck down).

**15.** *See, e.g., Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (an early filing deadline for independent candidates struck down).

**16.** W. Shakespeare, Hamlet, in 3 *The Complete Illustrated Shakespeare,* 342 (H. Staunton ed., 1979). "Corrupt influence, which is itself the perennial spring of all prodigality, and of all disorder; which loads us, more than millions of debt; which takes away vigour from our arms, wisdom from our councils, and every shadow of authority and credit from the most venerable parts of our constitution." Edmund Burke, Speech on the Economical Reform (Feb. 11, 1780).

**17.** *See, e.g.,* Benítez, *La Corrupción: El cáncer que corroe las entranas de la administración pública del país,* El Nuevo Día, Sep. 11, 1988, at 4, col. 1; *NPP–PDP Corruption flak worries mayors,* San Juan Star, Sep. 18, 1988, at 3, col. 1; *Exigencia Formal a la Comisión de Corrupción,* El Nuevo Día, Aug. 29, 1988 at 10, col. 3.

the legislative function; [and] a legal representative of the municipality in public acts and judicial proceedings. *Popular Democratic Party v. Ricardo Planadeball Poggy*, 88 JTS 80 (1988).

Section 3001(a)(6) is, therefore, a much-needed attempt to counteract the damaging effects of corruption in the offices of mayor.[18] The challenged statute punishes corruption but also deters it, both by denying those who have been once dismissed for improper conduct the opportunity to engage in such conduct again, and by reminding those tempted to wrongful acts that the result may be not only dismissal from a current office, but disqualification from a future one.

Section 3001(a)(6) accomplishes its desired effect in plaintiff's case. Plaintiff was found by the Complaints Commission, after eighteen days of hearings, to have engaged in nine acts of corruption, illegal manipulation of public funds, and gross negligence in the performance of his public duties. We cannot emphasize enough the gravity of these offenses. We note with irony the substantial impact on the rights of voters that results when the candidate the voters have elected to serve them abuses that privilege. To the extent that 21 L.P.R.A. sect. 3001(a)(6) works towards eradicating corruption in the public offices of this Commonwealth, we find it to be a legitimate and strong government interest.[19]

## C. WHETHER THE BURDEN ON PLAINTIFF'S RIGHTS IS NECESSARY TO PROTECT THE COMMONWEALTH'S INTEREST

We turn to the final prong of the analysis, namely the extent to which the Commonwealth's interest in preventing corruption makes it necessary to burden plaintiff's rights. We find that disqualifying plaintiff from running again for mayor in the elections following his dismissal, i.e., the 1988 elections, is necessary to protect the Commonwealth's interest. In the instant case, plaintiff was dismissed only last year, 1987, for offenses largely involving the misuse of public funds. To return him this year to the very same office, with the cache of public funds again at his disposal, is uncomfortably akin to letting the child loose in the candy store. By disqualifying a potential candidate in the election following his dismissal, punishment and deterrence for that wrongdoing are assured. Disqualification for the election following the dismissal will also add to the publicity surrounding the dismissal, further assuring that the voters are aware of the actions of their elected official. If 21 L.P.R.A. sect. 3001(a)(6) were not in effect, we realize the practical difficulties in investigating, charging, hearing, and deciding complaints concerning public corruption, all within one electoral term, only to have a dismissed official returned to office in the subsequent election. We find, therefore, that 21 L.P.R.A. sect. 3001(a)(6) can be applied to disqualify plaintiff from the mayoral ballot in the forthcoming 1988 elections without violating equal protection.

On the basis of the particular facts before us, we uphold 21 L.P.R.A. section 3001(a)(6) as constitutional under the equal protection clause. We emphasize that the litigant before us seeks a position on the ballot for the election immediately subsequent to his dismissal from office. We do not, then, decide the constitutionality of this statute when applied to a litigant who has been dismissed and seeks to run for mayor not in the election immediately fol-

---

18. Plaintiff alleges that because the disqualification provision in section 3001(a)(6) applies only to mayors, and to no other Commonwealth office, it violates equal protection. "The Equal Protection Clause allows the state to regulate 'one step at a time, addressing itself to the phase of the problem which seems most acute'." *Clements v. Fashing*, 457 U.S. at 969, 102 S.Ct. at 2847 (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)).

19. We note that some provisions of the Federal Election Campaign Act of 1971, sect. 301 *et seq.* as amended, 2 U.S.C.A. sect. 431, *et seq.*, were sustained because of the substantial governmental interest found in preventing corruption and the appearance of corruption in the elections of public officials. *See Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

lowing his dismissal, but in a subsequent one.

Although we do not decide the issue, this Court has grave reservations about the constitutionality of the disqualification provision of 21 L.P.R.A. sect. 3001(a)(6) extending beyond the election immediately following the term in which a person is dismissed. If the statute is construed to bar a dismissed candidate only from the election following his dismissal, he will be barred at most eight years (if the dismissal occurs soon after an officeholder is elected) and at least four years (if the dismissal occurs just before the end of the officeholder's current term). This maximum eight year disqualification, we find, is necessary to protect the Commonwealth's interest. A disqualification of more than eight years is likely, however, to contravene the United States Constitution.[20]

In *Chimento*, the seven year residence requirement for governor, although not an outright ban, was viewed as approaching the constitutional limit, 353 F.Supp. at 1217; in *Anderson*, the total exclusion of independent candidates after the filing deadline was a factor in striking it down, 460 U.S. at 792, 103 S.Ct. at 1571; in *Clements*, the fact that the challenged provision caused a candidate to wait two years—one election cycle—persuaded the Court to uphold it. 457 U.S. at 967, 102 S.Ct. at 2845. But 21 L.P.R.A. sect. 3001(a)(6), as written, is absolute in its operation. It disqualifies permanently.

Once a person's disqualification extends beyond the subsequent election following his dismissal, the balancing of the injury to plaintiff's rights and the interests of the Commonwealth will shift dramatically. If, as the statute now reads, a potential candidate is forever barred from all future elections, the impact on voters' rights will increase; the chances of surviving a constitutional equal protection challenge will correspondingly decrease. After all, even after the voters have had ample opportunity to assess an officeholder's dismissal and the

reasons for it; they still will be refused an opportunity to vote for that officeholder in an election occurring years later. The absolute ban also ignores the rehabilitation possible in the interim period between dismissal and the second election following that dismissal. If such rehabilitation does occur, the Commonwealth's interest will be achieved, and disqualification under 21 L.P.R.A. sect. 3001(a)(6) could no longer be justified. Section 3001(a)(6) would then extend beyond what is necessary to protect the Commonwealth's interest.

The discretion inherent in 21 L.P.R.A. sect. 3001(a)(6) also calls into question the constitutionality of extending the disqualification beyond the first election following the dismissal. The threat of political discrimination looms large when a member of one party may be subject to dismissal for improper conduct at the hands of members of an opposition party. Unlike 21 L.P.R.A. 3001(a)(5), wherein a person can be disqualified forever from the mayoral ballot for *conviction* of a felony or misdemeanor involving moral turpitude, there is no such objective standard operative here. Instead, a potential candidate can be *forever barred* from the mayoral ballot because of a previous dismissal for "improper conduct." This discretionary standard, coupled with the political climate of this Island, could be the means by which the party in power could exclude an opposition party from the ballot. When such a class of candidates is excluded, the impact on voters' rights may become too great to uphold 21 L.P.R.A. sect. 3001(a)(6) as constitutional. *See Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836. We need say no more. However, we assume that the Commonwealth legislature will reexamine section 3001(a)(6) to conform it to equal protection safeguards.

In conclusion, although no plaintiff is present before us who is threatened with disqualification from the second election after a dismissal, we hold that such a plaintiff would present a grave question as to

---

**20.** *See Popular Democratic Party v. Ricardo Planadeball Poggy*, 88 JTS 80 (1988) (Negrón García, dissenting).

the constitutionality of the absolute bar found in 21 L.P.R.A. sect. 3001(a)(6) under the equal protection clause of the United States Constitution.

WHEREFORE, plaintiff's complaint and request for injunctive relief is hereby ordered DISMISSED.

IT IS SO ORDERED.