**NEW PROGRESSIVE PARTY (PARTIDO NUEVO PROGRESISTA); Senator Nicolas Nogueras–Cartagena, as a member of the Senate of Puerto Rico, and as a qualified voter in Puerto Rico elections; Angel Luis Ocasio, Juan Burgos–Ortiz, qualified voters in Puerto Rico elections, Plaintiffs,**

**Republican National Hispanic Assembly of Puerto Rico, Lynette Alvarado Rosas, Arturo J. Guzman Vargas, qualified voters in Puerto Rico elections, Plaintiffs–Intervenors,**

**v.**

**Hon. Rafael HERNANDEZ COLON, Governor of Puerto Rico; Commonwealth of Puerto Rico; State Elections Commission (Comision Estatal De Elecciones) of the Commonwealth of Puerto Rico, President Juan R. Melecio, Commissioners Eudaldo Baez Galib (PDP), Carlos Canals (NPP), Manuel Rodriguez Orellana (PIP), Defendants.**

Civ. No. 91–2232 HL.

United States District Court,
D. Puerto Rico.

Nov. 15, 1991.

Mirta E. Rodriguez–Mora, Dept. of Justice, Fed. Litigation Div., San Juan, P.R., for Eudaldo Baez Galib.

Manuel Rodriguez Orellana, pro se.

Wanda Rubianes–Collazo, Santurce, P.R., for the Republican Nat. Hispanic Assembly of P.R., Lynette Alvarado Rosas and Arturo J. Guzman Vargas.

## OPINION AND ORDER

LAFFITTE, District Judge.

This case deals with a topic that has been a source of continuous debate in Puerto Rico throughout this century: the political status of the island. It is an issue charged with historical and emotional ramifications. This Court will focus on the legal aspects of the latest controversy regarding status.

Before the Court is an action to enjoin a referendum scheduled to be held in Puerto Rico on December 8, 1991. Plaintiffs and plaintiff-intervenors ("plaintiffs") claim that Acts 85 and 86, which call for the holding of the referendum, will violate their First, Fifth, and Fourteenth Amendment rights; that the language on the ballot of the referendum is unfair, vague, and confusing; that the registration process will disenfranchise certain voters; that provisions of the law enacting the referendum violate the Constitution of the Commonwealth of Puerto Rico; and that the referendum contravenes the federal laws that established the Commonwealth of Puerto Rico.

### I.

Plaintiffs, the New Progressive Party (NPP), Senator Nicolás Nogueras–Cartagena, Angel Luis Ocasio, and Juan Burgos–Ortiz, filed a complaint shortly after the enactment of Act 85 on September 17, 1991. The complaint named as defendants Rafael Hernández Colón, the Governor of Puerto Rico; Miguel Hernández Agosto, President of the Senate of Puerto Rico; José R. Jarabo, Speaker of the Puerto Rico House of Representatives; the Commonwealth of Puerto Rico; and the State Elec-

Nicolas Nogueras–Cartagena, San Juan, P.R., pro se and for New Progressive Party, Angel Luis Ocasio, Juan Burgos Ortiz and Carlos Canals.

Jose Trias–Monge, Arturo Trias, Hector Melendez–Cano, San Juan, P.R., for Rafael Hernandez Colon and Com. of Puerto Rico.

David Rive–Rivera, Vargas & Rive, San Juan, P.R., for State Elections Com'n of Com. of Puerto Rico and Juan R. Melecio.

tions Commission of the Commonwealth of Puerto Rico ("the Commission").

This Court dismissed *sua sponte* the initial complaint against Miguel Hernández Agosto and José Jarabo, on the grounds that the complaint failed to request any relief against them. Because plaintiffs had failed to join indispensable parties, and because the complaint originally failed to comply with the requirements of F.R.Civ.P. 8(a) and 8(e)(1), plaintiffs were granted leave to amend. The amended complaint joined as party defendants the President of the State Elections Commission Juan R. Melecio, and Commissioners Eudaldo Báez–Galib, Carlos Canals, and Manuel Rodríguez–Orellana. The Court held hearings on October 17 and 25, 1991. The parties filed their respective briefs on October 30. The case was finally submitted for adjudication on November 1st, 1991. The Court is now ready to rule.

Two statutes are the center of this dispute. Act 85, the "Act to Guarantee Democratic Rights," was enacted on September 17, 1991. It provides for a referendum to be held on December 8, 1991, whereby the people of Puerto Rico would vote for or against six propositions. The second law at issue is Act 86, the "Enabling Act of the Referendum on the Claim for Democratic Rights," which was approved on October 2, 1991. Act 86 provides for the procedures by which the State Elections Commission of Puerto Rico shall conduct the referendum. Among its provisions are sections on the ballot format (Sec. 3), the publicity campaign to be carried out by the Commission (Sec. 7), and the registration of voters (Secs. 6 & 13).

On August 28, 1991, defendant Hernández Colón submitted a bill to the Commonwealth legislature to amend Puerto Rico's Constitution. The language of the amendment was essentially the same as that which would later be incorporated into Act 85's Claim for Democratic Rights. An amendment to the Puerto Rico Constitution requires a two-third majority vote of the Legislature before it can be submitted to the people for a vote. P.R. Const. Art. VII, sec. 1. The Governor's proposed amendment failed to obtain the requisite two-thirds majority. Shortly thereafter the Legislature, responding to the Governor's recommendation, passed Acts 85 and 86. It is the enforcement of these laws which plaintiffs seek to enjoin.

## II.

### A. *Jurisdiction*

■ This Court is presented at the outset with a number of threshold issues. The first is the question of whether a federal court has subject matter jurisdiction over a suit to enjoin a referendum on the political status of Puerto Rico. Federal courts have jurisdiction over cases or controversies arising under the U.S. Constitution or federal statutes. This referendum deals with the future political status of the Commonwealth of Puerto Rico. Such a topic necessarily involves the nature of the relationship between the United States and Puerto Rico and an examination of the federal laws that established Puerto Rico as a Commonwealth of the United States. It may also require a determination of what effect, if any, this referendum will have on the relationship between the United States and Puerto Rico.

Federal courts in the past have adjudicated disputes arising out of Puerto Rico's electoral laws and procedures. *See, e.g., Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982); *Partido Nuevo Progresista v. Barreto Perez,* 639 F.2d 825 (1st Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981); *Torres–Torres v. Comision Estatal de Elecciones de Puerto Rico,* 700 F.Supp. 613 (D.P.R.1988); *Partido Nuevo Progresista v. Hernandez Colon,* 415 F.Supp. 475 (D.P.R.1976). In addition to their other claims, plaintiffs also allege that the timing of the referendum works a disenfranchisement on certain voters, and that Acts 85 and 86 violate their First, Fifth, and Fourteenth Amendment rights. Plaintiffs raise in their complaint both constitutional issues and questions pertaining to federal statutes. A federal question is present, and this Court there-

fore has jurisdiction under 28 U.S.C. sec. 1331.

■ Defendants assert that this case is not justiciable because it presents a political question. A case presenting a political question is not justiciable. However, the fact that a suit involves a political right does not mean that it presents a non-justiciable political question. *Baker v. Carr,* 369 U.S. 186, 209, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). A case involving a political issue may also have a constitutional dimension which merits adjudication by a federal court. Additionally, it is the role of federal courts to enforce federally protected rights that may be violated by local electoral laws. *Torres,* 700 F.Supp. at 618. Plaintiffs claim that Acts 85 and 86 infringe on their constitutional rights. This case presents a justiciable question and is therefore properly before the court.

B. *Standing*

Defendants challenge plaintiffs' standing to bring this cause of action. Initially, we note that plaintiffs are challenging the referendum on two distinct grounds. One, they claim that the State Elections Commission's alleged inability to register all eligible voters would amount to an unconstitutional denial to these citizens of the right to vote. Two, they claim that the referendum itself violates their First, Fifth, and Fourteenth Amendment rights; Public Law 600,[1] and Public Law 447,[2] and the Puerto Rico Constitution.

■ The issue of standing goes to whether a plaintiff has alleged such a personal stake in the outcome of a case or controversy as to warrant federal court adjudication of his claim. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). A litigant has standing to sue if it can show that it has suffered an actual or threatened injury as a result of the defendant's conduct. *Valley Forge Christian College v. Americans United For Separation Of Church And State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d

700 (1982). Furthermore, the injury must be fairly traceable to the challenged action and must be likely to be corrected by a decision in plaintiff's favor. *Id.*

■ Plaintiffs claim that the Electoral Commission cannot adequately register those citizens who are handicapped, recently-moved, absent from the island, or currently-incarcerated. A plaintiff challenging the disenfranchising effects of a state law does not have standing to represent a class to which it does not belong. *Rosario v. Rockefeller,* 410 U.S. 752, 759 n. 9, 93 S.Ct. 1245, 1250–51 n. 9, 36 L.Ed.2d 1 (1973); *People Organized For Welfare & Employment Rights v. Thompson,* 727 F.2d 167, 173 (7th Cir.1984). None of the individual plaintiffs claims to be a member of any of the groups that they allege are being denied adequate voter registration facilities. No individual plaintiff can say that he or she is being deprived of the right to vote. Therefore, the individual plaintiffs do not have standing to challenge any disenfranchising effects of the Commission's registration system.

■ The New Progressive Party (NPP) is also a plaintiff in this suit. An organization has standing when it alleges a "concrete and demonstrable injury" to its activities. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). It appears that the NPP's activities would suffer an injury if the alleged disenfranchisement did take place. Therefore the NPP has standing. *See also Kasper v. Bd. Of Election Com'rs Of Chicago,* 814 F.2d 332, 344 (7th Cir.1987) (Republican party had standing to challenge city's voter canvassing procedure); *Rainbow Coalition Of Oklahoma v. Oklahoma State Election Bd.,* 685 F.Supp. 1193, 1196 n. 11 (1987) (challenge to Oklahoma's ballot access and voter registration laws; court proceeded to a determination on the merits because of the importance of the issue and the need to provide a speedy resolution, even though the injury to one of

---

**1.** 64 Stat. 319; 48 U.S.C.A. sec. 731b–e (West 1987).

**2.** 82nd Congress, 66 Stat. 327 (1952).

the plaintiffs, a political party, appeared to be minimal).

▮▮▮ Plaintiffs' second claim is that the referendum itself will violate the U.S. Constitution, the Puerto Rico Constitution, and Laws 600 and 447. To have standing, a plaintiff must allege (1) a personal injury, actual or threatened, that is (2) caused by the defendant's allegedly unlawful behavior and (3) is likely to be redressed by the relief sought. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Here, plaintiffs allege, among other things, that the referendum will violate their First Amendment rights. This is an injury redressible by the enjoining of the referendum. Accordingly, plaintiffs have standing on this issue.

### C. *Eleventh Amendment*

▮▮▮ Defendant State Elections Commission claims that it is protected from suit by Eleventh Amendment immunity. The Eleventh Amendment provides general protection to a state from suits brought against it in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). A private party may not entertain a suit against a state in federal court when the state has not waived its immunity and when the state or one of its agencies is a named defendant. *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160. To be entitled to injunctive relief against a state government, a plaintiff must name a state officer as a defendant. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). For purposes of Eleventh Amendment immunity, the Commonwealth of Puerto Rico is treated as a state. *Puerto Rico Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 9 (1st Cir.1990). Here, two of the defendants are the State Elections Commission and the Commonwealth of Puerto Rico. Because these two defendants are immune from suit under the Eleventh Amendment, they are not amenable to suit in federal court. The action against them shall be dismissed.

▮▮▮ The Court notes, however, that there remain as defendants the president of the Commission, Juan R. Melecio, and Commissioners Eudaldo Báez–Galib, Carlos Canals, and Manuel Rodríguez–Orellana. The Eleventh Amendment immunizes states from suits for damages in federal court, absent abrogation by Congress of this protection or waiver by the state of the immunity. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The plaintiffs in this case are seeking an injunction, not money damages. Regardless of any congressional abrogation or state waiver of immunity, federal courts have the power to enjoin state officials to conform their conduct to the requirements of federal law. *Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir. 1983); *see also Ex parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). Accordingly, this action remains as against the Commissioners in their official capacity.

▮▮▮ There remains the issue of whether Governor Rafael Hernández Colón is a proper party defendant in this action. A state officer is a proper party defendant, provided that officer has some connection with the enforcement of the statute in connection. *Ex parte Young*, 209 U.S. at 156–58, 28 S.Ct. at 452–53. The duty of the Governor of Puerto Rico is to execute the laws of the Commonwealth or to cause them to be executed. P.R. Const. Art. IV, Sec. 4. The issue in this case is whether Acts 85 and 86 should be enjoined from enforcement. Governor Hernández Colón is charged with ensuring that these laws be executed. Accordingly, this Court finds that he is a proper party defendant in this action. *See Partido Nuevo Progresista v. Hernandez Colon*, 415 F.Supp. at 477–78.

### D. *State law claims*

▮▮▮ Plaintiffs claim that Acts 85 and 86 violate the Puerto Rico Constitution. Specifically, they claim that the laws violate Art. VII, which establishes the procedure to amend the constitution, and Art. III, sec. 17, which sets forth proceedings by which the legislature is to enact laws. District

courts have original jurisdiction of civil actions that arise under the Constitution and laws of the United States. 28 U.S.C. sec. 1331. The claims that Laws 85 and 86 violate the Constitution of Puerto Rico do not create a question that arises under the federal Constitution or laws. These are issues to be properly raised in the Commonwealth courts.

■■■■ Furthermore, the sovereign immunity of states prevents federal courts from ordering state officials to conform their conduct to state laws. *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911. Pendent jurisdiction over state claims is barred by the Eleventh Amendment when the relief sought is an injunction against state officials. *Id.* at 121, 104 S.Ct. at 919. In this case, plaintiffs are in federal court to enjoin state officials from holding a referendum. To the extent that their claim is based on rights protected under the laws and Constitution of the United States, this court may address it. However, plaintiffs' pendant state claims are hereby dismissed because they seek to enjoin defendants to conform their conduct with the Puerto Rico Constitution.

### III.

Plaintiffs challenge the referendum on two general grounds. One, the holding of the referendum will disenfranchise some voters because the Commission does not have adequate resources to register all those eligible to vote in the time between the passage of Act 86 and the holding of the referendum. Two, the referendum itself will violate plaintiffs' First, Fifth, and Fourteenth Amendment rights, and will also violate Laws 600 and 447.

**3.** The Court notes that previous referenda or plebiscites in Puerto Rico generally have had much longer time periods between the passage of the law calling for a referendum and the actual voting itself. For example, the law for a vote to approve or reject Law 600 was enacted on August 30, 1950; the referendum on the law was held more than nine months later, on June 4, 1951. Law No. 27, Aug. 30, 1950. The law calling for a vote on amending the Puerto Rico Constitution was promulgated on August 20,

### A. *The voter registration issue*

■■■■ Act 85, which called for the holding of a referendum on December 8, was enacted on September 17, 1991. Act 86, which provides the mechanism and guidelines for conducting this referendum, was enacted on October 2, 1991. It states that the State Electoral Commission shall determine the deadline by which Puerto Rico's citizens must register to vote for the referendum. The Commission set as the deadline November 8. *See* Official Regulation, Title I, r. 6, Oct. 5, 1991.

Plaintiffs allege that thousands of otherwise eligible voters would be denied the right to vote in the referendum by the State Election Commission's inability to register them all on time. Plaintiffs also claim that other citizens, particularly absentee voters, would not be able to vote because of the short period of time to register. Citizens who have not yet registered have 52 days from the enactment of Act 85 and 32 days from the enactment of Act 86 to register.[3] The classes of alleged affected citizens included prisoners, absentee voters, and people who had recently come of voting age. The court held an evidentiary hearing on this issue.

The record shows that out of 3611 applications for absentee ballots for the 1988 general election, 2800 did exercise their right to vote in absentia. The record further shows that the Assistant to the Chairman of the Commission in charge of electoral matters estimates that 50% of the absentee voters will vote. This leaves approximately 1400 potential absentee voters that may be affected by the November 8th cut-off registration date. In Puerto Rico, where the 1988 San Juan mayoral election

1952. The vote took place two and a half months later, on November 4, 1952. Law No. 16, Aug. 20, 1952. On December 23, 1966, a law calling for a plebiscite on the status of Puerto Rico was approved. The plebiscite was held seven months later, on July 23, 1967. Law No. 1, Dec. 23, 1966. On June 28, 1969, a law for a vote to amend the Constitution was enacted. The vote was held over a year later, on November 1, 1970. Law No. 138, June 28, 1969.

has been decided by as little as 29 votes,[4] and in the 1980 gubernatorial elections by less than half of one percent, 1400 absentee voters may very well affect the outcome of the referendum. While there is reason to be concerned about jeopardizing the rights of absentee voters due to the shortness of the registration period (37 days from date of enacting Act to November 8) or the Commission's capacity to register all eligible citizens, the infringement, if any, affects both the proponents and the opponents of the referendum equally. This issue must necessarily await the holding of the referendum. Should these votes affect the results of the referendum, plaintiffs then may pursue all the remedies available in the Electoral Code for post-election challenges, with the advantage then of a fully developed record. *See Granados–Navedo v. Acevedo,* 932 F.2d 94 (1st Cir.1991) (holding the availability of adequate and reasonable state corrective measures is an important consideration in determining whether or not federal constitutional issues are implicated). *See also, Bodine v. Elkhart County Elec. Bd.,* 788 F.2d 1270, 1272 (7th Cir.1986) ("federalism concerns caution against excessive entanglement of federal courts in state election matters"). Furthermore, federal courts cannot adjudicate every state election irregularity as though it were a constitutional violation. *Kasper,* 814 F.2d at 340. Therefore, this part of plaintiffs' claim is dismissed.

B. *Laws 600 and 447*

■ Plaintiffs claim that the holding of the referendum will violate Public Law 600, 64 Stat. 319, and Public Law 447, 66 Stat. 327. They allege that Acts 85 and 86 enacting the referendum are inconsistent with the compact created by Laws 600 and 447. Plaintiffs also allege that Acts 85 and 86 violate "Law 600's absolute requirement that the people of Puerto Rico have a republican form of government." Whether a law is a denial of the right to a republican form of government is a nonjusticiable political question. *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 150–51, 32 S.Ct. 224, 231, 56 L.Ed. 377 (1912). Accordingly, plaintiffs' claim that Acts 85 and 86 infringe upon the right to a republican form of government is rejected.

■ Before examining the claim that the referendum is inconsistent with Laws 600 and 447, the history of these laws, however briefly, should be considered. The 81st Congress passed Public Law 600 in July 1950. The Law, which first had to be approved by the people of Puerto Rico in a referendum, called for the holding of a convention to draft a constitution for Puerto Rico. The law was voted on and approved on June 4, 1951. A constitution was later drafted, approved in a referendum, and submitted to Congress. Congress approved the constitution, with certain conditions on July 3, 1952 in Law 447.[5] Public Law 447 approved the Constitution "in the nature of a compact" with the Puerto Rican people. It was through the passage of and compliance with these two acts that Puerto Rico became a United States Commonwealth. Plaintiffs claim that the referendum will violate both statutes.

In December 1966, the Puerto Rico Legislature enacted a law to hold a plebiscite in July 1967 on the political status of the island. The voters in the referendum were to choose one of the three status alternatives for Puerto Rico: commonwealth, statehood, or independence. The results were to be an authorization to the Puerto Rican legislature to petition Congress for a change in status if either statehood or independence won, or to continue with the development of the existing commonwealth

---

**4.** *Granados v. Rodríguez Estrada,* 90 JTS 114 (1990).

**5.** For a thorough analysis of the historical and legal framework out of which the status controversies arise, *see* Helfeld, *Congressional Intent and Attitude Towards Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,* 21 Rev. Juridica, Univ. de P.R. 256 (1952).

*See also* Peruse, *The United States and Puerto Rico, Decolonization Option and Prospects* (1987); Liebowitz, *Defining Status, A Comprehensive Analysis of United States Territorial Relations* (1989); Helfeld, *How Much of the U.S. Constitution and Statutes are Applicable to the Commonwealth of Puerto Rico?,* 110 F.R.D. 452 (1985).

status if that alternative won. A group of plaintiffs sued to enjoin the holding of this referendum on a number of constitutional grounds. *Barbosa v. Sanchez Vilella*, 293 F.Supp. 831, 833 (D.P.R.1967). The Court held that the plebiscite was nothing more than a vehicle for the people of Puerto Rico to express their will. *Id.* at 833. The plebiscite would not change the political status of the island; such a change would have to be agreed to by the United States Congress. Thus, the plebiscite had no effect on any federally protected rights and the court refused to enjoin it. *Id.* at 833–34.

We think this case is similar. The referendum provided for in Act 85 is a first step to amend the Constitution of Puerto Rico and a petition to the Congress and the President of the United States to respect these rights when action on the future status of Puerto Rico is taken. Act 85, Section 3. Like the plebiscite in 1967, this referendum is simply an expression of public opinion. Its approval would be nothing more than a request that the federal government respect certain rights. Thus, it can have no legally binding effect on Laws 600 and 447.

If plaintiffs are saying that the approval in the referendum of the Declaration of Democratic Rights will alter the relationship created by Laws 600 and 447, their claim is not ripe for decision. Under Article III of the Constitution, federal courts can only adjudicate cases that present concrete legal issues. *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). To do otherwise would be tantamount to granting an advisory opinion, something federal courts are not empowered to do. *Id.* A federal court cannot make legal determinations based on the hypothetical occurrence of future events. *International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd*, 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954). *Barbosa*, 293 F.Supp. at 834. If such future events never occur, the decision will turn out to have been unnecessary.

Here, the outcome of the referendum is uncertain. If the six proposals are defeated in December, plaintiffs' claim regarding Laws 600 and 447 will be moot. If the proposals are approved, another referendum must be held to amend the Constitution. The voters may approve or reject the six proposals. If the Constitution is amended, then the Court may address whether such amendments would contravene Laws 600 and 447. However, this issue will not be ripe for decision until the Claim for Democratic Rights becomes an amendment to the Puerto Rico Constitution. To make this decision before the referendum is held would be the equivalent of an advisory opinion. Accordingly, this Court declines to address these issues now.

## C. *Equal Protection*

 Plaintiffs also claim that the approval of the Claim for Democratic Rights will provide for a cultural "homogenization" of the Puerto Rican culture. This, they allege, would violate the equal protection rights of those citizens who are not of Puerto Rican descent. We assume that plaintiffs are referring to that part of the Claim which seeks to protect "the right that any consultation on status guarantees, under any alternative, *our culture, language and identity*, which includes our international sports representation." Act 85, sec. 2. (emphasis added). The question of whether or not this language violates plaintiffs' equal protection rights is not ripe for decision. *See United Public Workers v. Mitchell*, 330 U.S. at 89, 67 S.Ct. at 564. The approval of these Claims may in the future have an effect on plaintiffs' equal protection rights. The Court takes no position on this issue now. *See Diaz v. Board of County Com'rs of Dade County*, 502 F.Supp. 190, 193 (S.D.Fla. 1980) (Plaintiffs sought to enjoin a referendum to make English the official language of Dade County. Court denied the injunction on the grounds that the question of the effect of the referendum's passage was not ripe for decision; the actual act of voting did not violate plaintiffs' constitutional rights). This Court will only be able to address this issue if and when the Claim

for Democratic Rights becomes a statute or constitutional amendment. Until then, the question of its constitutional validity is not properly before this Court.

### D. *Due Process*

Plaintiffs challenge on due process grounds, the constitutionality of Acts 85 and 86 of the Legislative Assembly of Puerto Rico, approved on September 17, and October 2, 1991 respectively. Act 85 provides for a referendum to be held on December 8, 1991 as a first step in the tortuous process of modifying the political status of Puerto Rico. Act 86, its counterpart, is the Enabling Act providing the funding, mechanics, procedures and directives for the referendum, under the aegis of the State Elections Commission ("Comisión Estatal de Elecciones"). In essence, plaintiffs challenge the validity of Section 3 of Act 85, and Section 3 of Act 86 on First, Fifth, and Fourteenth Amendments grounds, and seek to enjoin the referendum. Defendants have raised procedural as well as substantive defenses in support of the dismissal of the complaint and of the constitutionality of both Acts.

The thrust of plaintiffs' challenge to Acts 85 and 86 is that they are fundamentally unfair and therefore in violation of the equal protection and due process clauses of the United States Constitution. Plaintiffs further contend that Acts 85 and 86 are confusing, vague, deceitful and one-sided on the side of the "Yes" vote. Defendants counter that the statutes are neutral in content and valid. Because plaintiffs' claims on this aspect of their complaint present a close question, the Court considers it essential to set forth the relevant constitutional framework as it relates to the substantive provisions of Acts 85 and 86 at issue.

More than a century ago it was recognized that voting is "a fundamental political right, because it is preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220

(1886). The right to vote freely without undue restrictions is basic to the freedoms guaranteed by the Constitution because it goes to the essence of a democratic society. The "administration of the electoral process is a matter that the Constitution largely entrusts to the states. But in exercising their power of supervision over elections and in setting qualifications for voters, the states may not infringe upon basic constitutional protections." *Kusper v. Pontikes*, 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). *See also, Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *United States v. Bathgate*, 246 U.S. 220, 38 S.Ct. 269, 62 L.Ed. 676 (1918).

Likewise, the state's broad power to prescribe the time, place and manner of elections "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986). That constitutional safeguards apply in local elections and referenda is no longer open to discussion. As forcefully stated by the First Circuit: "Voting in local elections and referendums is subject to constitutional protection." *Griffin v. Burns*, 570 F.2d 1065, 1075 (1st Cir.1978). Lastly, the Supreme Court has held that "it is clear that the voting rights of Puerto Rico citizens are constitutionally protected *to the same extent* as those of all other citizens of the United States," and "Puerto Rico is subject to the constitutional guarantees of due process and equal protection of the laws." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 7–8, 102 S.Ct. 2194, 2198–99, 72 L.Ed.2d 628 (1982) (emphasis added).[6] Because plaintiffs' claims implicate federally protected rights it is the

---

**6.** The Puerto Rico Supreme Court has likewise recognized that the due process and equal protection clause of the United States Constitution fully apply to Puerto Rico. *Ortiz v. Barreto Pérez*, 116 D.P.R. 84 (1980) (Trias Monge, C.J.).

solemn responsibility of the federal courts to guard, enforce and protect every right granted or secured by the Constitution of the United States, whenever they are properly before the court. *See Partido Nuevo Progresista v. Hernandez Colon,* 415 F.Supp. 475 (D.P.R.1976) (Three–Judge court decision holding unconstitutional a provision of the Puerto Rico Electoral Code on First Amendment and vagueness grounds). Under appropriate circumstances, a federal court has the power to exercise its injunctive authority to intervene in a state referendum, but the decision to intervene should always be taken with the utmost caution. *Hammer v. Campbell,* 358 F.2d 215 (5th Cir.1966), *cert. denied,* 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79; *State of Alabama v. United States,* 304 F.2d 583 (5th Cir.1962); *Holmes v. Leadbetter,* 294 F.Supp. 991 (E.D.Mich. 1968).

### 1. Interplay of Acts 85 and 86

Act 85, the "Act to Guarantee Democratic Rights," provides in essence for a referendum on the following *claim* consisting of *six propositions.* Section 2 states:

It is provided that the following Claim for Democratic Rights be submitted to the people of Puerto Rico for their approval: [7]

We, the people of Puerto Rico, solemnly claim that the following democratic rights be guaranteed in our Constitution:

(1) the inalienable right to determine our political status, freely and democratically

(2) the right to choose a status of full political dignity without colonial or territorial subordination to the full powers of Congress

(3) the right to vote for the three status alternatives Commonwealth, Statehood and Independence, based on the sovereignty of the People of Puerto Rico

(4) the right that the winning alternative in a status consultation shall require more than half the votes that are cast

(5) the right that any consultation on status guarantees, under any alternative, our culture, language and identity, which includes our international sports representation

(6) the right that any consultation on status guarantees, under any alternative, the American citizenship safeguarded by the Constitution of the United States of America.

Section 3 provides that:

This Act to Guarantee Democratic Rights expresses the feeling of the Legislature of Puerto Rico. The Claim for Democratic Rights contained herein constitutes a claim to the Government of Puerto Rico on the desirability to consecrate them in the Constitution of the Commonwealth of Puerto Rico, and a Petition to the Congress and to the President of The United States for these rights to be respected when taking any action on our political status. If it is approved by the people, the Claim for Democratic Rights may only be modified or revoked through consultation to the people and shall not be affected by the results of the general election.

Section 4 states that

The Claim for Democratic Rights provided by Section 2 of this Act, shall be submitted for approval to the qualified electors [voters] of the Commonwealth of Puerto Rico in a referendum to be held on December 8, 1991. The Ballot shall state that *this claim* constitutes a petition to the Congress and to the President of the United States.

Section 5 provides in part:

[T]he *Claim* for Democratic Rights is not a claim for a change of status. The results of the referendum shall not be interpreted to be in favor or against any status alternative or political party. Neither shall it be interpreted as a petition for separation, nor modification of the present status, nor the use of two flags,

---

**7.** The numbers in parentheses do not appear in the statute. The Court has numbered the propo-sitions for easy reference. The emphasis is also ours.

two anthems and the *two languages as provided by our judicial codes.*[8]

Section 3 of Act 86, the Enabling Act, provides in part:

> The Commonwealth Elections Commission shall design and print the ballot to be used, which shall contain, at least the following information:
>
> On the ballot, there shall appear across the top part thereof the following:
>
>> "Referendum for approval or rejection by the electors of the Claim for Democratic Rights *approved* by the Legislature of Puerto Rico."
>
> Underneath that, there shall be two columns. On the top part of the first column, there shall appear the following sentence:
>
>> "Vote in favor of the *Claim* for Democratic Rights."
>
> Under this sentence, there shall appear as an insignia the word "YES", and underneath that, there shall be a space for the elector to make his mark.
>
> On the top part of the second column, there shall appear the following sentence:
>
>> "Vote against the *Claim* for Democratic Rights."
>
> Under this sentence, there shall appear as an insignia the word "NO", and underneath, there shall be a space for the elector to make his mark.
>
> ... Below these two columns there shall be printed across the breadth of the ballot the *Claim* for Democratic Rights as approved by the legislature and which reads as follows:
>
> (The six propositions are transcribed)[9]

Section 4 provides that:

> Commonwealth Elections Commission shall have the responsibility of organizing, implementing and supervising the referendum process provided in this Act,

as well as any other function conferred to it by virtue of this Act.

Section 7 states:

> The State Elections Commission shall implement a campaign to inform and guide Puerto Rican electors on the *contents* of the Claim for Democratic Rights submitted to [a] vote; the manner in which they shall mark their ballot to consign their vote therein ...

Section 8 provides that

> The duly registered political parties may participate in the referendum provided their central directing bodies notify the Commonwealth Elections Commission within 15 days following the effective date of this Act.... All the parties that notify the Commission of their intention to participate in the referendum shall be entitled to be represented in the polling places as provided in the Puerto Rico Electoral Law ...

(Emphasis added)

Section 22, which provides the funding for the referendum, provides in part:

> The sum of $4,700,000 is hereby appropriated to the Commonwealth Elections Commission to defray the cost of ... the referendum ... to be distributed as follows:
>
> | | |
> |---|---:|
> | 1) To organize and carry out the referendum | $3,000,000 |
> | 2) For the payment of transportation of electors who need to go to vote within the same precinct | 300,000 |
> | 3) For the orientation and information expenses as provided in Section 7 of this Act | 1,400,000 |
> | | $4,700,000 |

**2. Fairness of the Referendum**

 We start with the proposition that the people of Puerto Rico have the right to pursue changes and modifications and find solutions to political status in the exercise of their right to self determination; that the right of petition, speech, press and assembly are fundamental and inseparable, *Thomas v. Collins*, 323 U.S.

---

8. The Official Language Act, Act 4 of April 5, 1991, establishes and declares that Spanish is to be the official language to be used at all agencies and offices of the Executive, Legislative and Judicial branches of the Government of Puerto Rico. The Act repeals a statute that had provided for the use of both English and Spanish in government matters since 1902. The "Spanish

only statute" has created considerable controversy and is presently pending challenge in this Court. *Nogueras v. Hernández Colón*, Civ. 91–1429(PG).

9. Attached to this opinion is a facsimile of the official ballot, filed by the State Elections Commission at the Court's request.

516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); and that initiative or popular referendum enjoy First Amendment protection. At present forty-nine of the fifty states require that amendments to state constitutions be submitted to a statewide vote. Charles D. Gordon III and David B. Magleby, *Preelection Judicial Review of Initiatives and Referendums*, 64 Notre Dame Law Review 298 (1989). It is fundamental that in authorizing a referendum or a constitutional initiative, the legislation governing such a process may not run afoul of constitutional safeguards. To avoid these pitfalls and to minimize the risk of voter confusion and deception, many jurisdictions require that a measure may not encompass more than a single subject. California, for instance, has a constitutional provision that not more than one subject may be submitted to the electors or have effect. Cal. Const. Art. II, sec. 8, subd. (d); *Amador Valley Joint Union High School Dist. v. State Board of Equalization*, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978).[10] The framers of the Puerto Rico Constitution, while rejecting the methods of direct initiative, recall, and popular referenda, opted to limit any constitutional amendment to three proposals with the explicit mandate that "each proposed amendment shall be voted on separately and not more than three Amendments may be submitted at the same referendum." Article VII, Section 1. Laws of P.R.Ann. Title 1.

Plaintiffs claim that Acts 85 and 86 are unfair, confusing, and tilted towards the supporters of the "YES" formula, because:

1) the title of the Act, "Claim for Democratic Rights," is so appealing that voters would not reject such an expression of democratic ideals,[11] and consequently, it is the present administration, not the people, making the choice;

2) the legend at the top of the ballot,[12] "Referendum for Approval or Rejection by the electors of the Claim for Democratic Rights *Approved* by the Legislature of Puerto Rico," carries a message to voters that the "Claim for Democratic Rights," put to a "YES" or "NO" vote, has already been approved by the legislature and therefore insinuates a "YES" vote;

3) the referendum includes six proposals inducing voters to vote for all, notwithstanding that they might not have voted for all of the amendments had they been submitted separately;[13]

4) the Claim for Democratic Rights contains misrepresentations regarding the United States citizenship;

5) the Claim for Democratic Rights is a blatant attempt to freeze Commonwealth status and to close the door to other forms of status options, i.e., independence or statehood, by including in the proposals matters such as United States citizenship, culture, language, identity, and international representation in sports;

6) the channeling of campaign funds through the Commonwealth Elections Commission places the plaintiffs at a disadvantage because the Commission is controlled by the ruling party, a participant in the referendum on behalf of the "YES" vote;

8) Act 85 does not provide for a write-in vote.[14]

Defendants contend that the statutes are neutral in contents; constitute a valid exer-

---

**10.** *See Comment, Judicial Review of Initiative Constitutional Amendments*, 14 U.C. Davis L.Rev. 461 (1980); Lowestein, *California Initiatives and the Single–Subject Rule*, 30 UCLA L.Rev. (1983).

**11.** The ballot has been designed, pursuant to Section 3 of Act 86, for the voter to accept or reject "the Claim for Democratic Rights." *See* facsimile of ballot attached hereto.

**12.** Section 3 of Act 86 provides for this wording and its place on the ballot.

**13.** Plaintiffs Lynette Alvarado and Juan Ortiz Burgos wish to vote "YES" as to some and "NO" as to others of the six proposals.

**14.** Concerning plaintiffs' allegation that Act 85 precludes a write-in vote, the Court finds *Burdick v. Takushi*, 937 F.2d 415 (9th Cir.1991) dispositive. "Although the voter has a protected right to voice his opinion and attempt to influence others, he has no guarantee that he can voice any particular opinion through the ballot box."

cise of legislative power; do not violate the United States Constitution; and, the issues presented are not ripe for adjudication.

Act 85 constitutes a clear example of *"logrolling,"* [15] a practice explicitly rejected by Article VII, Section 3 of the Commonwealth Constitution ("each proposed amendment shall be voted on separately and not more than three shall be submitted"). However, the issue before the Court is not whether Act 85 contravenes the letter or spirit of the Commonwealth Constitution—a matter on which we express no opinion—but whether Act 85 is in conflict with the Due Process clause of the United States Constitution on the grounds of unfairness, vagueness and one-sidedness.

Every election conducted under the aegis of a democratic government has necessarily the imprimatur of the state and therefore must be balanced, impartial and neutral to the contestants. This is not only a duty but an obligation of government.[16] A referendum is a form of political speech at the center of democratic values. Free speech values require that the proposals submitted be clearly identified, free of confusion, and each one separately submitted for approval or rejection. The *Claim* for Democratic Rights lumps into *one claim six proposals*, forcing the voter to either reject or adopt them all, and has the effect of weighting the ballot in favor of the "Yes" vote.

Let us examine, for the sake of brevity, only two of the six proposals. Proposal number 1 [17] of the Claim for Democratic Rights provides "the right to choose a sta-

tus of full political dignity without colonial or territorial subordination to the [plenary] full powers of Congress." Voters are not told, and there is silence in Acts 85 and 86, that the source of constitutional power for the exercise of federal authority in Puerto Rico is the Territory Clause.

> "The argument that the Territory Clause does not apply [to Puerto Rico] is tantamount to a claim that there is no constitutional source for federal lawmaking in Puerto Rico.... Not surprisingly, every court to consider the Territory Clause issue has reaffirmed that the Territory Clause provides the fundamental constitutional source of authority governing the relationship between the United States and the Commonwealth."

*U.S. Insular Areas, Applicability of Relevant Provisions of the U.S. Constitution,* GAO/HRD-91-18, p. 60-61.

Likewise, if proposal number 1 is to be read for the proposition that the Tenth Amendment may be made applicable to Puerto Rico in lieu of the Territory Clause, the matter is fraught with controversy and ambiguity:

> We also have concerns with some provisions that define the Commonwealth option. For example, section 402(a) would declare that Puerto Rico "enjoys sovereignty, like a state, to the extent provided by the Tenth Amendment" and that "[t]his relationship is permanent unless revoked by mutual consent." These declarations are totally inconsistent with the [U.S.] Constitution. Under the Territory Clause of the U.S. Const. Art. IV, cl. 2, an area within the sovereignty of the

---

15. Logrolling has been defined as a "practice of including in one statute or constitutional amendment more than one proposition, inducing voters to vote for all the entire measure, although they might not have voted for the entire measure if several amendments or statutes had been submitted separately." Black's *Law Dictionary,* 5th ed. p. 849.

16. Governor Hernández Colón, one of the defendants in this case, recognized this principle regarding legislation on the status of Puerto Rico when he implored Congress to approve balanced options in any status bill:
"In order for the decision to rest with the people of Puerto Rico, the U.S. Congress has

to present them three balanced options. If the options are unbalanced, if Congress loads the choices in a way that steers the Puerto Rican people to select a particular outcome, it is Congress which will have made the choice, not the people." (Governor Rafael Hernández Colón at the Hearing before the Committee on Finance of the United States Senate, One Hundred and First Congress, held on November 14, 1989 in relation to S. 712 at page 12.)

17. The numbering is used for ease of reference, though they appear unnumbered in Section 2 of Act 85.

United States that is not included in a state must necessarily be governed by or under the authority of Congress. Congress cannot escape this constitutional command by extending to Puerto Rico the provisions of the Tenth Amendment, which by its terms apply only to the relationship between the federal government and states. We also doubt that Congress may effectively limit, by a statutory mutual consent requirement, its constitutional power under the Territory Clause to alter Puerto Rico's Commonwealth status in some respect in the future. Not even so-called "enhanced Commonwealth" can ever hope to be outside this constitutional provision.

*Statement of Dick Thornburgh, Attorney General, before the Committee on Energy and Natural Resources, United States Senate, concerning S. 245, The Puerto Rico Status Referendum Act,* Feb. 7, 1991.

Both the statements of the GAO and the Attorney General's rest on the jurisprudence of the United States Supreme Court, which in its most recent expression, *Harris v. Rosario*, states:

> Congress, which is empowered under the Territory Clause of the Constitution, U.S. Const., Art. IV, § 3, cl. 2, to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States," may treat Puerto Rico differently from States so long as there is a rational basis for its actions.[18]

It should be remembered that Puerto Rico has been since 1901, and continues to

be, an unincorporated territory.[19] The constitutional ramifications which flow from Puerto Rico's being an unincorporated territory are that Congress has plenary authority when legislating for Puerto Rico to treat Puerto Rico as equal to a state or to discriminate in favor or against Puerto Rico.[20] Even should Congress decide to exercise its lawmaking authority in Puerto Rico to the extent provided by the Tenth Amendment, it may do so only by virtue of the Territory Clause. Hence, the inescapable truth is that the Territory Clause is, and will continue to be, under our federal constitutional scheme, the source of congressional authority over Puerto Rico. That basic constitutional reality can only be changed if the people of Puerto Rico should decide to opt for statehood or independence.

Proposal number 6 states: "The right that any consultation concerning status guarantee, under any alternative, the American citizenship safeguarded by the Constitution of the United States of America." United States citizenship is highly valued by most Puerto Ricans. The format of the ballot is such that a "NO" vote implies that United States citizenship is in jeopardy, and that only a "YES" vote would assure U.S. citizenship. This means that *independentistas* who want to vote in favor of the first five proposals are forced to vote "YES" on a proposition that is historically inconsistent with the struggles, philosophy, and ideology of the *independentista* movement. "Independence for

---

**18.** 446 U.S. 651, 652, 100 S.Ct. 1929, 1933, 64 L.Ed.2d 587 (1980). In *Harris,* the Supreme Court found that Congress had a "rational basis" for discriminating against Puerto Rico in the allotment of aid to family with needy dependent children, as compared with similar families in the United States. Thus, it is clear, beyond doubt, that the Territory clause is the source of Congress' power to legislate over Puerto Rico. The scope of that power is plenary.

**19.** *Califano v. Gautier–Torres,* 435 U.S. 1, 3 n. 4, 98 S.Ct. 906, 907 n. 4, 55 L.Ed.2d 65 (1978), cites *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901), the origin of the doctrine of unincorporated territory, as authoritative precedent. *See also* Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* (1985).

**20.** *Compare Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980); *Americana of Puerto Rico, Inc. v. Kaplus,* 368 F.2d 431 (3rd Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967), *with Examining Board v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982). While there is a segment of Commonwealth advocates that rely on certain language in *U.S. v. Quiñones* 758 F.2d 40, 42 (1st Cir.1985), in support of the proposition that the Territory Clause does not apply to Puerto Rico, the comment is dicta and was not necessary to the decision, and therefore is lacking in precedential value.

Puerto Rico must mean real independence, which must include a loss of United States citizenship for residents of Puerto Rico." *Statement of the Attorney General*, at p. 24. Likewise, stateholders who may want to vote "YES" for proposals 1 through 6 may very well feel compelled to vote "NO" on account of proposal 5, which is inconsistent with the statehood ideology.

The Court agrees that some of the propositions in the "Claim" for Democratic Rights are confusing, vague, contradictory, and deceptive. This is the end result of the logrolling procedure permeating the referendum, and could have been easily avoided by having the six propositions submitted separately. Hence, a strong argument can be made that lumping into *one Claim* six distinct propositions, infringes upon the First Amendment right to petition, free of confusion, vagueness and ambiguities. When the election process suffers from unfairness there is precedent for federal intervention and relief.

But while ... local election irregularities, including claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures exist, there remain some cases where a federal role is appropriate. The right to vote remains at bottom, a federally protected right. If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 is therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state is germane. *But there is precedent for federal relief where broad-gauged unfairness permeates an election even if derived from apparently neutral action.* (citations omitted) (emphasis added)

*Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir.1978).[21]

Other aspects of plaintiffs' claims are not ripe for decision. Ante, pp. 10–17, but the claim that the ballot is unfair and confusing is ripe. The unfairness of the ballot is now present and will continue to be present throughout the referendum process and thereafter.

However, there remains a more difficult and sensitive question of whether unfairness justifies enjoining the referendum. Pre-election lawsuits challenging referendums inevitably draw the courts into the arena of highly charged political partisanship. Absent egregious circumstances, intrusion by federal courts into a local electoral matter is not warranted. The ballot is unfair. However, this unfairness does not rise to the level of a federal constitutional deprivation. Accordingly, it does not justify the drastic step of an injunction.

The Court is mindful that the proposal submitted to the voters may be rejected. If approved, a second referendum must be held to amend the Constitution of Puerto Rico. Consequently, this or any future referendum is not binding on Congress. The President may ignore it or take no action thereon.

"Congress retains all essential powers set forth under our constitutional system, and it will be Congress and Congress alone which ultimately will determine the changes, if any, in the political status of the island." [22]

Even though the potential for confusion in the referendum is great and that the process appears tilted towards the "YES" vote—a matter that in the future may weigh heavily in Congress—this Court concludes that the sound constitutional course to follow is to defer to the voters and to the free competition of ideas. At this stage, it is for the voters, not this Court, to decide whether "YES" or "NO" on the ballot will prevail.

**21.** For garden variety irregularities *not* warranting federal relief, *see Navedo v. Acevedo,* 932 F.2d 94 (1st Cir.1991); *Partido Nuevo Progresista v. Barreto–Pérez,* 639 F.2d 825 (1st Cir.1980).

**22.** Concurring statements of Representative Crawford and Delegate Barlett of Alaska during debate on Law 600, 81st Cong., 2d Sess., Cong. Record, June 29 and 30, 1950, p. 9595.

WHEREFORE, the petition for injunctive relief is denied and the complaint ordered dismissed without prejudice. Judgment shall be entered accordingly.

IT IS SO ORDERED.

APPENDIX

# Referéndum para la aprobación o rechazo del electorado de la Reclamación de Derechos Democráticos aprobada por la Asamblea Legislativa de Puerto Rico.

| Voto a favor de la Reclamación de Derechos Democráticos. | Voto en contra de la Reclamación de Derechos Democráticos. |
|---|---|
| **SI** | **NO** |

Nosotros, el Pueblo de Puerto Rico, solemnemente reclamamos que se garantice en nuestra Constitución, los siguientes derechos democráticos:

- el derecho inalienable a determinar libre y democráticamente nuestro status político
- el derecho a escoger un status de plena dignidad política sin subordinación colonial, ni territorial, a los poderes plenarios del Congreso
- el derecho a votar por las tres alternativas de status, Estado Libre Asociado, Estadidad e Independencia, fundamentadas en la soberanía del Pueblo de Puerto Rico
- el derecho a que la alternativa triunfante en una consulta de status requiera más de la mitad de los votos emitidos
- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, nuestra cultura, idioma e identidad propia, que incluye nuestra representación deportiva internacional
- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, la ciudadanía americana que salvaguarda la Constitución de los Estados Unidos de América.

Esta Reclamación constituye un reclamo al Gobierno de Puerto Rico para que estos derechos se consagren en la Constitución del Estado Libre Asociado de Puerto Rico y una petición al Presidente de los Estados Unidos y al Congreso para que estos derechos sean respetados al actuar sobre nuestro status político.

COMISION ESTATAL DE ELECCIONES